Mr. Blank, on behalf of the EQT Production Company, we will reserve 5 minutes for rebuttal. District Court abused its discretion and there are three main reasons that this appeal should be granted and certification reversed. First, at the core, these class actions are property right cases. Property rights cannot be decided without all the parties at issue in the case. Property rights cases cannot be decided without looking at the underlying conveyancing documents. Class actions are not designed to do such analysis because of the commonality issue that is required under 23B. Second, the classes should not have been certified because rigorous analysis would have evidenced that individual issues predominate when there are thousands of tracts of property, thousands of severance deeds, thousands of leases, thousands of parties, no evidence of any damages of any damage model or damage expert. Do we know how many surface owners there are in this case? We don't, Your Honor. That's one of the problems with the district court's analysis. The rigorous analysis wasn't done to even determine how many claimants there are. The best guess is that there's over 10,000 gas or surface owners. Do we have any idea of what the language is in those severance deeds with regard to those individuals? Again, no, Your Honor. We don't. Well, that's one of the problems with the rigorous analysis. It wasn't done in this case. You can't decide property rights issues in the abstract. You can't do it because you have to go to those underlying conveyance documents and you have to have all the conflicting claimants here. Virginia Gas and Oil Act governs this case. And in that act, which was set up to safeguard conflicting claimants' rights, one thing that the Gas Act requires is that you identify the conflicting claimants. CNX and EQP did that over the last 22 years. Another element is that they have to escrow the royalties. There's no dispute they did escrow the royalties over the last 22 years. The act is clear that in order to get the money out of the escrow, you need a final decision of a court of competent jurisdiction adjudicating the ownership of coal bed methane as between the conflicting claimants. The class can't do that in the aggregate. The class actually can't do that without looking at and analyzing those severance deeds that Justice Keenan just raised. Let me ask you a question about the factual background that I'm not really clear on. I understand the fracking issues with regard to the coal bed. Do we have Marcellus shale issues in this case or not? This is not a Marcellus shale. This is a coal bed methane. Only coal bed. That's correct. Okay. Just wanted to make sure. There's no uniform declaration that can advance this litigation because of the Virginia Gas and Oil Act, because the requisite commonality doesn't exist. You say can't at least on this record, but would it be appropriate if we agreed with you to send it back to see whether or not there could be subclasses created that would divide these into manageable sub-issues? I don't think so, Your Honor, and the reason why is twofold. One is you don't have all the claimants in the case, and that's why you can't drive towards subclasses because the coal claimants aren't in this case. Well, Buckhorn intervened, what, in the Addison cases? Is that correct? Buckhorn in the Addison, Torch in the shale case, but those are only part of hundreds of coal owners that are conflicting with the gas estate. Do we have any idea on this record how many coal owners there are at issue here? We don't. We don't know how many. The best guess is that there's hundreds, if not thousands, that are identified coal claimants. One of the things that concerns me is you've got a lot of property owners here, and the production companies and coal companies have been taking gas from their properties for a good many years, for decades, and nobody, as I can see, has ever recovered so much as a cent. None of the property owners have recovered so much as a cent in terms of royalties. And, you know, it seems to me you might be content just to let this escrow system go on indefinitely, but how these many property owners who are owners of the gas estate in this land, how are they going to ever get the royalties that presumably are due? Your Honor, with all due respect, that statement isn't true. Millions of dollars have come out of this, of the escrow account. Have they been paid? They have been paid. The appendix 4455, you can see where Senator Puckett went to the board and actually applauded the board for the efforts of the operators and the royalty interest that have been paid. Millions of dollars have come out of this account of conflicting claimants. I'm not talking about non-conflicting claimants. I'm talking about conflicting claimants in this case because there's three available options to get this money out. You can do it by agreement, which it's done. You can do it by adjudication, which it's done. And you can do it by a voluntary arbitration. And that's the crux here. They have a method to do so. And the populist... Is the transaction a superior method? It's not a superior. The reason that it's not a superior method is because you don't have the coal claimants in to bind them. It can't possibly be a superior method when the act requires an adjudication between the conflicting claimants. That's the key crux here. You don't have the conflicting claimants here in this case. The plaintiffs in this case understood that. When they brought this case, the first complaint had the gas estate as the class versus the John Doe unknown coal claimants. But they realized when they got into it that the commonality is destroyed with the severance deeds that Justin Sakinian brought up. And so what did they do? They asked to amend the complaint to create this concept called an illusory conflict. There's no such thing as an illusory conflict. Not in this case. Not in this state. The conflict is real. And how do we know that? In three weeks, Belcher versus Swartz Creek, will be decided up the street in Virginia Supreme Court dealing with conflicting claimants where the coal estate has sued the gas estate. Okay. And the writ was granted as to language of deed talking about coal and other things. Isn't that correct? And I assume you've been following the briefing in that case. I have. Has the argument expanded beyond the words coal and other things? It has. The arguments include so many…  If you could go in a little bit on that. Yes, Your Honor. The argument consists of the coal estate claimants have made is not only is it the coal and other things, but the issue back to Harrison-Wyatt, did it deal with the frack gas versus the gob gas? As you know, because you were at Harrison-Wyatt, it was a gob gas case. It didn't deal with the frack gas. And there are other issues that the coal claimants want to make, which says, in addition to analyzing these severance deeds, you also have an issue with the gob gas versus the frack gas. And the frack gas wasn't decided in Harrison-Wyatt. So, they've also briefed that issue as well. Can't invade the coal seam, according to the coal claimants, without their permission. And that's an issue. And it can't be decided on a class basis. It has to be decided on a deed by deed, lease by lease. Are there common questions here? The class action is regionally based in the southwest part of Virginia. It's governed by Virginia law. I assume all of them deal with the escrow concept. All of them deal with gas estates. I assume that the royalty accounting methods that EQT uses are uniform throughout the escrow accounts. I mean, there are common aspects to this. It's not a nationwide class action. It's not governed by a variety of different laws. I just, and I suspect that there are common questions in terms of the way the escrow accounts are handled, both in terms of royalty accounting, and also in terms of the deductions that you're making, in terms of whether you're taking severance deductions. Also, in terms of whether you're paying a sufficient amount. into the escrow accounts, that there may be some standardized mechanism by which you are deciding how much you're going to put into the escrow accounts, what you're going to deduct, and what the formula is that you're using to determine how much you're going to contribute to those accounts. Now, why aren't those elements here? The answer goes back to Walmart versus Dukes. You can come up with those common questions, but you don't have common answers that drive this litigation, specific to what you said, Your Honor. The variables, when you get underneath, the rigorous analysis wasn't done, but when you get underneath the variables, they're changed over the course of all these thousands of claimants. They change over time. Someone that was pooled and produced in 1998 may have a different component than someone that was pooled in 2010. Within a specific unit itself. But if you have a common method of determining royalty, and you have a common accounting method, and you have a common contribution method into the escrow account, can't the individual differences in how many royalties are due one person or another? Isn't it our class actions routinely decide that? Your Honor, with all due respect, not since Walmart versus Dukes. Since Walmart versus Dukes, every class action case has come down. Cheatham versus XCO in the 10th Circuit. Foster versus Apache in the Western District of Oklahoma. Foster versus Merritt. Morrison versus Anadarko. Tucker versus BP. They've all looked at that issue, and they said, first you've got to look at the leases. If the leases have different language, then all the accountings are different. You can't get there. And in the deemed lease situation, the variables drive it. The plaintiffs didn't put on one shred of evidence. What are the material variances in the leases that you think are important? Mr. Smith will talk about it, but the language itself in the leases can vary from at-the-wellhead language versus post-production deductions that are specific, including but not limited to gathering, compression, transportation. You have to look at them on an individualized basis. What are these alternative means of resolving the disputes in your view? Why are they likely to be effective so that the property owners and landowners can actually get what's coming to them where gas has been removed from their land? You talked about adjudication being one of those. Tell me about these alternative methods, and tell me why you think they're superior to a class action in terms of resolving this. They're superior because property rights can't be decided without all the parties at issue. You cannot have a property rights decision on ownership and then the royalty unless you have the first underlying fundamental premise, which is you have a different claimant looking for the same money. If you don't have them in the same courtroom, you're not adjudicating the ownership. You're not following the action. How are the property owners supposed to proceed? They file a suit in state court, anywhere in the common law. As they've done, there's a master scheduling order that we talk about in the appendix. There's 20 to 30 of these cases sitting out there in Buchanan. How many of them? I think there's 20 to 30 of them that have been sitting out there, but there have been some that aren't even adjudicated. In the very courtroom that this case comes from, the Western District, the Heirs of Destiny's case, that's how that case gets settled. Mr. Blank, it sounds to me really like your argument is suffering from one defect, and that is you're asking us to conclude that all of these problems are fatal. I agree with you. There are massive problems connected with this class action, but don't we have an even larger umbrella problem in that the district court didn't address them? They did. They did. You're correct. I mean, the district court didn't talk about the breach of contract claims. It didn't talk about all these ownership problems. It didn't talk about common answers in Walmart. Why isn't it appropriate to remand to the district court with Swords Creek pending and with all of those issues that the district court didn't address before simply concluding this is impossible? I've thought about that long and hard, and it may help the court, both this court and the district court, to hear what the Supreme Court says in Swords Creek. The fundamental problem that the court can't get over is the Virginia Gas and Oil Act saying that it has to be as between conflicting claimants. It doesn't really matter what happens in terms of the decision. It does the litigants in Swords Creek between the coal estate and the gas estate. It confirms that there still is conflict, and you can't do it in the abstract. You have to have these parties in the courtroom, and the plaintiffs knew that. The court knew that. Throughout the entire record, what you have is we can't make an all-encompassing decision without the proper parties before the court. They can do it by split agreements under the statute, which is the coal estate and the gas estate come together, make an agreement, and decide to split it in a certain way, and the winds of time have changed what that split is, whether it's 50-50, 90-10, 60-40. The General Assembly acknowledged that and believed that. They can come with a voluntary arbitration, or the General Assembly, who we're in the shadows of, they can change the statute and determine that there's a different way, but it can't be done under the Rule 23 context. It just simply is not a construct set up for this issue. With all due respect, the federal court system shouldn't try to change what the statute set up through the Rule 23 construct, especially with the record that we have where the analysis wasn't done count-by-count. Chieftain v. XCO, again, gives instruction that you have to look at each one of these causes of action, determine the elements. You will not find those elements throughout the record that's before us. I'll yield the floor to Mr. Smith. Mr. Smith? Thank you, Your Honor. Good morning to the court. My name is Mike Smith. I'm with the Christian Barton Law Firm in Richmond, and I'm here today on behalf of EQT. And in the small amount of time remaining, if the court will permit me, I would like to talk about the contract cases in the Atkins and the Kaiser cases. I've got a couple points I want to make time for me. One, variation in language. There are very similar problems between the contract cases and the deed cases. The difference is, one difference is, the contracts are leases in this case. There are thousands of them. Most were individually negotiated and individually entered into. Some are more than 50 years old. Many have been amended, sometimes in handwriting. Each lease has its own royalty payment language. There aren't form leases used. Now, interestingly enough in this case, early on, the plaintiff asked for copies of all the leases, and they were provided. So far as I know, there's been no effort to categorize them, analyze them by either the plaintiffs, and of course the court hasn't been able to do it. It doesn't have the staff to do it. Well, that suggests that it ought to go back for that purpose. You concede that point, that it ought to go back to do just that, to categorize these leases? I will concede that sending this case back, referring it back, is certainly a realistic possibility, is certainly a realistic possibility, remanding this case. But on this record, there has been no rigorous analysis of anything. What happened in Kaiser and Atkins with regard to the magistrate's recommendation being turned around by the district court? If you'll allow, please. The district judge reversed it quietly. We have nothing from Judge Jones on this. We have nothing. Any analysis that was done was done by the magistrate. But the point in fact is, even the magistrate didn't have but roughly 20 leases at the time in the record, and 12 of those leases were put in by EQT. It's not EQT's burden at that point in time to put the leases in and make the point on class certification. But it's wrong. The only leases that the plaintiffs have brought in are the leases that were attached to the plea, the requisites of the class. There just has been nothing in this case that looks anything like rigorous analysis. Judge Diaz, you asked the question about sending it back. Of course it can be sent back, and of course a rigorous analysis can be done, and of course issues of subclass and all can be decided. On these leases, however, there is one issue that militates against that, and that's the statute of limitations. The trilogy of cases in this court, starting with Broussard and Thorne or Grinnell, those cases stand for the proposition that when plaintiffs allege fraudulent concealment as a ground to equitably stop defendants from pleading the statute of limitations, that's not suitable for class treatment. Those three cases say it. I think it's Grinnell's that says we don't care what other courts may say about this. It is clear in the Fourth Circuit that questions of fraud, questions of reasonable reliance, those questions are not certified. That is one difference, Judge Diaz, in sending it back for class treatment. I don't believe, and I think Judge Wilkinson is fairly clear on this in Broussard, that would be very difficult to create any kind of class with that statute of limitations case sitting there. And by the way, in the Atkins case, for instance, Judge Kinney, in the Atkins case, that's been paying out. Those royalties have been paid out. And some of the people who have taken the royalties have been taking them for 25 years. I would direct your attention to the appendix at page 3895. You will find a letter there that has everything in the world to do with these cases on these leases. Let me ask you a question. The point is made in your reply brief that money in escrow cannot be released without some judicial determination of the ownership of the CBM between conflicting claimants. Is that true in every one of these cases? No, sir. First of all, what kind of conflict are you talking about? And second of all, what kind of judicial determination are you talking about as a precondition to releasing royalties? Well, on the royalty issue and the releasing of the royalties, Mr. Blank is better equipped to deal with that issue than I am. But let me describe the fields as I understand them to you, and this may get to your question. I hope that it does. In one field, Adkins, royalties have been paid over the years. They've been paid like clockwork. In fact, the lessors have accepted the money over time. That has interesting sets of limitations, manifestations, and it also has interesting what did the parties intend when they signed the contract going forward as it relates to withholding the deductions and charging them against the royalty. Another field are the deemed leases that Mr. Blank was talking to you about. That's where the Oil and Gas Board has come in and issued an order which becomes, for all intents and purposes, and it's convoluted and complicated, for all intents and purposes, the lease. It becomes the lease in the deemed lease cases. Then there are the cases where there is ownership disputes where money is escrowed. Then there's Adkins where there are voluntary leases and the money flows like water. That's not a problem. So the leases don't have the same nature problem that the ownership cases have. If that helps at all, Judge Wilkinson. Now, one thing interesting about this appendix document that I referred you to, it's brought in the statute of limitations. This is a lessor who writes EQT in 1991 and says, I see that you've been charging against my royalty deductions for post-production deductions. EQT writes back and says, yes, we have, and this is the reason why. In the first letter, there was a thinly veiled threat to bring a suit against EQT. Let me ask you sort of a global question. Yes, sir. And that is, are you telling us today that the better way to resolve these cases is through individual suits in state courts? The cases are governed largely by state law. The state courts already have a number of these cases which have been brought by individual lessors and landowners before them. The relevant decisional law and the relevant statute are all Virginia statutes. And so, as I pick up what you are saying and what Mr. Blank is saying, is that this really is more of a state matter to be handled under the requisite Virginia statutes and to be handled under the Virginia decisions, Harrison and the like, which the state courts are familiar. They're already dealing with a lot of these cases on an individual basis. And that's simply, when we get to what is the superior mechanism here, having these suits go forward in state courts and continuing that process is preferable to a massive unwieldy class action. Is that the overall point you're making? It is an overall point, and may I add to it a little bit this way. The problem with the class action is you're going to have individual cases anyhow. The leases are going to have to be tried. Somebody sometime is going to have to look at those leases. So, if you have a class action, you hadn't moved the ball. You kicked the can down the road. You're going to have all of those issues being tried. The lease language has got to be considered at some point in time. Now, I will say, and I'll say this to you on your point. I want you to wrap it up quickly, okay? I'll wrap it up very quickly. We've got more circuit court judges than we've got federal district judges in southwest Virginia. They are questions of Virginia law, and it should be decided that way. Thank you, sir. Ms. Cabresa, we'd be happy to hear from you. Thank you, Your Honor. Good morning, and may it please the court. Elizabeth Cabresa for the athlete plaintiff's classes. I think the questions that Your Honors have asked this morning really do frame the question here, the overall question. This is, in terms of a fact pattern, the antithesis of the Walmart case. Class actions have become exciting in the past few years. The Supreme Court has given us new guidance. Could you move that microphone down a little bit? Yes, Your Honor. I think it might help. That's great. Has given us new guidance in Walmart and in Amgen. But this case, these cases, these five cases, are classic class actions. They are local. They are regional. The predominant questions turn on a single decision from the Supreme Court of Virginia and one sentence. Which decision? That would be the Harrison-Wyatt version. I'll just add as well. In that case, the coal vein, the CBM gas had migrated. Totally, we don't know what the situation is with the coal beds here and where the gas is. The court wasn't saying in any case, irrespective. Now, the Virginia statute has taken care of certainly part of that. But how do you, you don't have a clear answer. I mean, isn't that why Swords Creek is addressing and acknowledging the fact that all these deeds say different things? And you've got coal and other things. You have potentially thousands of different terms in the severance deeds. It's not a clear answer from Harrison-Wyatt. It seems to me you're oversimplifying it. And perhaps doing a disservice to your cause. Because I do understand the fact that there are many small property owners, surface rights, gas estate owners, who may not have it be economical to their advantage to have to litigate these cases individually. But it doesn't serve their interest just to say Harrison-Wyatt case closed because it doesn't close the case by any matter of means. Your Honor, and I did not mean to imply that it did. And far be it from me to try to tell you what the meaning of that case is. The point that I was making is that unlike the more sprawling class actions, the ones that have come under criticism, this is a classic class case. Because whatever the ultimate meaning of the Ratliff decision and its progeny, including Swords Creek, and the one sentence codification of the coal bed methane gas ownership issue in the Virginia statute, there are a limited number of patterns to these leases. The deemed leases are uniform categorically because they're not negotiated with the owners. But what about when you start with the ownership issue? Because isn't that the threshold that even gets this thing going? Yes, Your Honor. And what sets up this litigation as a quintessential case for class action adjudication, including through appropriate subclasses and through the designation of common questions, is that in response to the Supreme Court decision and in response to the more precise language of the statute, each of the defendants has systematically searched title, divided up coal and gas interests, made submissions under penalty of perjury under oath pursuant to title searches, gone before the Virginia board, gotten the orders, and then proceeded to extract the methane and put the payments, the royalty payments, in suspense. Do you know how many severance deeds are at issue in this case? There would be thousands of severance deeds, Your Honor. Do you know how many different forms of grants in grant language? I mean, is there any way of knowing that going into this case? There is a way of knowing that specifically by examining those leases, and it is something that can be done. We would argue that if this court believes it should be done on an ongoing basis in connection with class certification, then these cases, as the defendants agree, should be remanded to do just that. However, in terms of the certification by the district court, we also argue that that was not an abuse of discretion because based on the lease language that was submitted by both sides to the court, the court was able to ascertain that with respect to the issues in this case, not a deed language in toto, but with respect to the issues that matter in this case. For example, the issue of who owns the methane gas, the gas owner or the coal owner. With respect to the breach of contract cases, that class definition is restricted to leases that are silent as to the deductions. So while there might be many variations in non-material language of those deeds, the material provisions of those deeds for purposes of making the determinations of the basic issues in this case, the predominant common issues in this case. What about the absence of the coal owners? Your Honor, the district court has addressed the absence of the coal owners in two ways. First, as you heard, the major coal owners, the four major coal owners, which collectively have consolidated over half of the coal interests, are named parties in the suit. They participate in the briefing. They're interveners. So the court there has used the intervention rule to deal with that. Now, you might ask, what about the remaining coal owners? Those coal owners are being notified by the court. They are being sent direct mail notice pursuant to a notice program that the court is currently considering. And that notice tells the coal owners about the litigation, that there are summary judgment motions pending, and explains to them how to get more information about the suit and how to come into the suit. So any coal owner who truly wants to participate in this dispute will be able to do so before there is a final adjudication. So the due process requirements articulated by the Supreme Court in Taylor v. Sturgill are fully satisfied. Why can't this whole matter be better resolved in state court? There doesn't seem to be any federal question really here. You know, state law is peculiarly suited to adjudicating property rights. I mean, property rights is right at the heart of what state law is all about. They're going to be governed by state decisional law. The state statutes are salient. There are questions of state law. I mean, there are cases before the state circuit judges. And it doesn't seem to me, I don't understand what the federal interest is here. They're just conducting an interest analysis, which I think is fair to do with Rule 23. Why isn't the state's interest paramount here? Why should we be shoehorning this into a federal class action? Your Honor, the answer to that question is bound up in what the Supreme Court has said in Amgen most recently about Rule 23b-3 and the purpose of that federal rule. And this is a multi-state procedure, so bear with me for just a moment because I'm going to answer your question. As the Supreme Court said in Amgen, the office of a Rule 23b-3 certification ruling is not to adjudicate the case. Rather, it is to select the method best suited to adjudication of the controversy fairly and efficiently. That's Amgen at 133 Supreme Court, page 1191. And you might ask what business, and you did ask, what business does a federal court have applying this Rule 23 function in this case? And the answer is this. Congress has declared that reason, not in a particular subject matter statute. This is not subject matter jurisdiction. This is diversity jurisdiction. But the diversity jurisdiction comes from the Class Action Fairness Act of 2005. And in that act, Congress said, and I quote, the purpose. But I'm trying to ask which is the relatively superior method of resolving this. You know, the class action has problems simply because of the variances in the terms of the individual leases, because of ownership disputes, because of differences in damages. And the individual claimants here, the members of the class, are quite differently situated in some respects, not in other respects. You're always talking about a gas estate, and you're talking about their relationship to royalties and the escrow account. But in many respects, the individual class members are indeed differently situated. And the differences are not insignificant. So why is this a superior vehicle to letting these cases go forward on a more individualized basis in state court, where the state courts have a deeper fund of expertise, and they can account in individual actions for differences in individual circumstances? And we have to ask ourselves why the class action is a superior mechanism for attacking this whole issue. And that's what I want you to get at. Yes, Your Honor. It is the superior mechanism for attacking this whole issue. Why? It's not only the best mechanism, it's the only mechanism. Your Honor, the economics tell the tale. Every procedure has a price tag. And when we look at superiority, it's a relativistic analysis, and you have to deal with fairness, and you have to deal with efficiency, and you have to deal with economy. That's what the Supreme Court tells us. That's one reason why CAFA enables… Let's get down to this case. All right. This case… …about the economics. The economics are inexorable, Your Honor. There are approximately 90 accounts here that are being held in these escrows. They total approximately $26 million. In over half of the subaccounts, there are less than $5,000. In one-third of the EQT subaccounts, there are less than $1,000. In 127 of the CNX accounts, there are less than $1,000. The filing fee alone to file a declaratory relief action in the Virginia courts now, I believe, is $82. Since the Supreme Court and the statute have teed up this issue, there have been between 12 and 15 of these individual actions that have gotten all the way through the court system. The gas owners always win. I would imagine that there are slightly different circumstances among those cases as to what the leases say and what the interests are. You say the gas owners always win. The gas owners always win. There are 20 or 30 of these cases you heard pending. I don't know the exact number, but your Honor, if you look at the class, the minimum number of class members is 900. We know it's several thousand, but let's say it's 1,000. In 10 years, 15 have gotten through the state court system. 15. We're going to take, what, another 700, 800 years to go through these cases? There's a reason that there are so few of these cases. It's not just that the amounts are small. It's that every procedure has a price tag, and these cases cost money. There are only one or two attorneys. You're saying the individual class members lack the resources to hire lawyers and prosecute their cases through state court? Is that what you're saying? That is correct. It isn't economically feasible for a number of reasons, your Honor. The nominal amounts at stake, which are nominal, this money is important to these people, but it's not enough to justify an individual suit. Would it be consumed in attorney's fees? It would be consumed in attorney's fees, and in fact, the one or two attorneys currently taking these cases, I know one of them only takes a case that's worth at least $100,000, because under that, it's not economically feasible. So that means that the vast majority of the members in these defined classes are basically out of luck and out of court, were it not for the fact that the Class Action Fairness Act, which was enacted to provide prompt, prompt recoveries for class members. When I asked Mr. Blank whether royalties had actually been paid, the landowners, I said, well, we've been looking for decades and nobody's gotten any money, and he said, that's not correct, your Honor. There have been sizable royalties paid to individual landowners. Is that – is his representation correct there? There have been some sizable payments made, and those are primarily due to split agreements, where the oil and gas owners reach an agreement, which of course is another solution to the problem, but those are the larger interests where it's worth people having, you know, finding each other, having those negotiations, which would normally involve a lawyer as well. What about arbitration under the Virginia Oil and Gas Act? No one has used it, your Honor. No one has used it. Do you have any evidence as to why? Probably for the reasons that tend to beset arbitration. Enforceability. It wouldn't be a public – it wouldn't be a public determination. It wouldn't be precedential, at least with the state court proceedings. You have a body of jurisprudence that develops that people can look at and they can say, well, this was what Harrison Wyatt was about. You know, this is what this other case was about. Now I know, you know, where I stand. Arbitration can't do that under the statute of – all the parties would have to agree to arbitration, and that may be another barrier. So it just hasn't worked. It's an alternative, but it's not an available method, and the proof is it hasn't been available. Let me jump over to another issue, and that is you really don't think there was a rigorous analysis as that required by Walmart in this case. Do you perform by the district court or the magistrate's judge? I do think that there was a rigorous factual analysis performed by the magistrate's judge. Okay, but he had 60-some pages of facts. I agree. There are a lot of facts in the case. But in terms of the issues that we have to look at, in terms of commonality, predominance, we don't have it in front of us, do we? Here's what I would say about that, Your Honor. With respect to the deep dive into the factual record and familiarity with the factual scenario, I do believe that the court did a more than adequate job. I think the problem with the record, which is clearly correctable on remand if that's what the court wants to do, is with respect to the relative sparsity on the breach of contract issue, for example, that Your Honor raised, there is a real argument before Judge Jones. There's a transcript with specific oral argument on the leases in the Adkins case, which were the leases, the silent leases, the class definition, the fact that there were primarily common issues involved in the first marketable product rule and how it's applied. So there is a record there. What's the status of the breach of contract claim in the Addison case? Neither the magistrate judge nor the district court judge addressed that. I believe, Your Honor, that the district court in the Addison case? Yeah. In Adkins. I believe, Your Honor, that the district court certified that. That could be clarified on remand. Ms. Cabrera, you made a compelling case for the economics of why these claims might not be litigated at all but for this class action mechanism. But, of course, that may be necessary but by itself is not sufficient. And I think early on you said that or you implied that the ownership conflict, which you said in your brief, is in fact illusory because the plaintiffs have conceded or done the legwork with respect to ownership by filing these papers in court, escrowing the funds and dividing up the class by what they perceive to be the true owners of gas versus coal. Is that your argument, that there really isn't a conflict with respect to ownership? Your Honor, that is a common question. Our contention is that as between the gas and coal owners, that conflict is illusory pursuant to the statute. But the court didn't decide that and the court could decide that as a common question. And with coal owners who wish to be heard on that, that is a complete adjudication. I would note that most coal owners follow the jurisprudence and they've either relinquished their rights or don't consider that they have an interest in it. It would be to the benefit of the coal owners as well to have these questions decided once and for all within these class proceedings so that their rights are adjudicated as well. But what if they want to stand on the language of their particular sovereignty? Tough luck? Your Honor, if... I mean, you have literally, possibly thousands of different configurations of language in these cases. Maybe hundreds. That may be true, Your Honor. What if they want to stand on the language of their contract? If they want to stand on the language of their contract, they can intervene. They can show any language of their contract that might be material to the issue. It sort of gets to Mr. Smith's point, and this is what concerns me a little bit. He's saying you're going to be ending up trying these individually. You're going to be trying them on the language of the deeds. You're going to be trying them individually on all sorts of issues such as course of conduct, perhaps reliance. All sorts of issues are going to come out that will result in lack of common answers and individual answers. So how do you respond to that? Your Honor, the common questions still predominate, as Walmart and Amgen require. They predominate for these reasons. All of the issues that you identified are not issues that relate only to individual class members or co-owners, for that matter. They are issues that are recurring common issues that relate to subsets or subclasses or categories within the class that can be designated by objective means that do not rely on state of mind. There aren't reliance issues in this case. I beg to differ with respect to the statute of limitations argument. In the Thorne case, the Fourth Circuit said no, there's no categorical rule that it's an individual issue. What about course of conduct? The course of conduct by the defendants is identical. It is systematic. Their royalty methodology is identical for each defendant. Their course of conduct in identifying the conflicts and escrowing the funds and causing the royalties to be withheld, the deductions that they make, they don't go lease by lease. They have testified below, and there is a record on this, that they have standard deduction methodologies. Whatever the lease says, they're doing the same thing from field to field. What about the Thorne claims that are appended to this, the unjust enrichment claims and the conversion claims? It's possible that the defendants may have acted in a way that unjustly enriched them in one case but didn't in another, or that there was a conversion or trespass claim in one case that wasn't in another. Well, I mean, the variances in the contracts here, the lease agreements, are bound to be a little bit troubling. And then when you add additionally the tort claims, which are behaviorally based as opposed to textually based, doesn't that add a new element of individuation and variation to the whole procedure? Not really, Your Honor, because the tort claims, trespass, conversion, unjust enrichment are not state-of-mind claims. They are going to flow from the adjudication of the basic predominating issues. By the way, we have a uniform- Wouldn't the tort claims depend on the conduct of each defendant, of the two defendants, toward the various 900 or however many claimants there are? Well, they all derive from the royalty issue. So if the improper amount of deduction has been made, that can be framed as a breach of contract. It can also be framed as conversion or trespass on interest. These claims are very much dependent on the same fact scenario. And while they may have different formal elements, they really don't add in different individualized- Well, the rest of the claim would vary depending on the actions that each individual defendant took with respect to the land, whether they had authority, proper authority to go in. I'm sorry, Your Honor. These trespass claims have to do with trespass on the interest, not trespass on the property. So when you determine the propriety or impropriety of the deductions, you've resolved the conversion issue. You've resolved the trespass issue because you've adjudicated the appropriate division of monies between the lessor and the lessee. And with respect to lease language or contract language, the variations can be determined. They will fall into very limited categories to the extent they are material. The raw material is before the district court now. Even back in the days of Scrivener's leases, when these were beautifully handwritten with wonderful calligraphy back in the 18th century, they had boilerplate. That's where the word boilerplate comes from. Suppose this becomes unmanageable down the road. As we look at it now, and I know that we're not supposed to approve these certifications on the grounds that the district court can always be certified later. But just looking at it now, I guess it's been a year or more. The district court's dealt with this case for three years. It's been a year of fact discovering. And we're still sort of right at the beginning of things. And it looks very complicated. And there are individual variances right at the get-go, at the certification stage. And suppose the managerial difficulties just begin to multiply as the case moves forward. What happens then? I mean, what exit ramp is there if the case begins to prove utterly unmanageable down the road, and as you actually get into the fine print of the individual leases, there really are a lot of differences such that we're ending up with what is, in essence, however many trials. What is the exit ramp? The exit ramp is provided under the federal rules. And I think several recent decisions of Judge Posner are instructive on this point. First, the Butler case, which was a class certification for liability only with damages to be individualized. The court realized that there were resolution drivers that were common liability or common conduct issues that would drive the resolution even if damages needed to be individualized. The case that Judge Posner cites in Butler is the Johnson v. Meritier case involving 23 years of health plan benefit disputes, 10 separate classes, many, many variations. But he said if you look at this methodically, you do an accounting first, which is what we've asked for in this case, the equitable remedy of an accounting under B-2, and then the individual damages issues, variations issues, different documents, you categorize those, you create more subclasses. And even if you don't do that and you need individualized adjudications, which we don't believe will ever happen here because none of these leases and none of these scenarios is truly unique. They are patterns. You determine the patterns on a categorical basis. But even if you have individual issues at the end, what you've done is you've advanced the litigation as a whole toward resolution. That's the resolution driver in Walmart. And everyone in the class will be farther along than any of them would be if they had to rely on the only available alternative that defendants will posit, which is an individual case, pay-as-you-go case in the Virginia state court. So it's not just a matter of economics. It's a matter of efficiency and fairness. No procedure is perfect. This court has recognized this in Gunnell's and Central Wesleyan. No procedure is perfect, although we always strive toward that. But this is the best. Are there any cases that are analogous to this? I mean, any kind of remotely similar fact pattern? I would say the Meritor case in terms of an accounting first and then damages. Right, but in terms of real property ownership? Yes. Yes, Your Honor. And these cases we cited briefly in our brief, and there are a series of cases that involve contamination, property diminution. People with different interests in real property as opposed to damages that resulted from misuse. In those cases, Your Honor, one of the things that has to be done at some stage in those proceedings is to determine who those property owners or homeowners are. And so the class is defined objectively with respect to property owners within geographic meets and bounds or within the town of, this is the Medrick versus Metcoil case of Judge Posner cited in his Parco decision. Right, so that's in response to defining the damage, right? Yes, but in terms of- And you don't have an analogous type boundary drawing here, do you? We do. We have objectively defined class definitions, and the class members are those people that have been identified by the defendants in the course of doing their title searches. In the course of preparing for class notice, we have addresses for 7,905 of them. There are last addresses, and those are being updated. So what we have here is the basis to, we know who's in the class. We know how to notify people. We will have a procedure that people will have to prove up the nature of their ownership. What about heirs? Test to see? Have you accounted for that? Yes, Your Honor, that's what a class action is for. You deal with the present owners, and of course the membership of the class is fluid because people die, property ownership changes, and at the appropriate time in the case when it comes time to release the proceeds pursuant to the accounting, those people will have to come in and prove up. No class membership is self-executed. Isn't it a little different here because determining who the heirs are determines who owns the property. It's not just simply the back end, who gets the royalty, but who even owns the property in the first place. Your Honor, the ownership of the gas interest as opposed to the coal interest, the best possible way to establish that has already been done, and it may not be perfect, but it can be corrected in individual cases. So we know that categorically. So that's what we need to know at the class certification and notice stage, and we get direct mail to those notices, those people. Then what we would need to know at the payout stage is at that time who has succeeded to that interest, and that can be done through letters of administration, through the way that anybody proves up, for example, a wrongful death case. There has to be a judicial determination of ownership before the escrow monies can be released to someone. That would seem to make sense. That's correct. All right. Is the judicial determination there a class action determination? It's the administrative phase of a class action, which occurs in all these property contamination, diminution of value cases, where people come in and say, yes, I am the record owner as of this date. I inherited it. That kind of adjudication within the parameters of the class action would be what is meant. It stands to reason that you would have to get the ownership situation pretty straightened out before you release royalties to somebody. Are we talking about the district judge hiring a special master here? A special master, Your Honor, or a claims administrator. There are claims administrators that do this, for example. This wouldn't be something that the magistrate judge would do. You'd have to have a claims administrator to take care of it. That's probably right, although we're only talking about a few thousand rather than several hundred thousand or a million. For example, Your Honor, in the Deepwater Horizon settlement that's being administered now in the Fifth Circuit, the non-controversial aspect of that is with respect to claims based on waterfront property. The class was defined as people who owned property of a certain sort within a defined geographical area, but people have to come in and make claims, and they have to prove up their ownership. They have to bring in any other owners because many of these properties have multiple owners. It's the same situation here, and that's done by the claims administrator. Has there been a common method of determining what goes into the escrow accounts? Have there been common deductions taken? Yes, absolutely. Have there been common methods of accounting as far as what royalties are due? There really isn't. No, that's why we've asked for an accounting. There's a motion pending now not only for the determination as between gas and coal, but for an accounting of what's going into those escrow accounts because, Your Honor, what we know is this. The methodology for deductions from royalties and calculating royalties are absolutely uniform. The record is there on that. We also know that there is not an accounting when these monies are put in the escrow accounts. There is not an itemized accounting, and that's why we've asked for it. So you think that the – your briefs seem to indicate that you thought the companies were using ownership disputes as a pretext for not being forthcoming with respect to what was going on with the escrow accounts. If you wanted a greater degree of transparency with them, are you making a case that there is a significant degree of stonewalling with respect to the operation of the escrow accounts and that you need the class action to crack it open? We need the class action to solve this impasse and to crack everything open because it's a completely opaque system now. We don't – I can't stand here and tell you royalties have been improperly deducted from X lease because the owners have no – neither the coal nor gas owners have any knowledge of that because it's a black box. These escrow accounts are black boxes. We know that the defendants are fiduciaries under Virginia law with respect to these. You want to know what's going on. We want to know what is going on, Your Honor. We know that this is going on pursuant to a system. The record is clear about what the system is. The record is clear that it's a method. It's clear it's not individualized, but we don't know what it is. We don't know whether everything that should be in those escrow accounts is in those escrow accounts. If every penny that was in those escrow accounts were in them, they might be larger. They might even justify individual litigation, but probably not, and that's why we have a 23B2 class for the threshold claim, which is an equity claim under Virginia law for an accounting by a fiduciary. All right. Thank you. Thank you very much. Mr. Blythe, let's hear from you, sir. Thank you, Your Honor. First, I'll try to respond to three issues. One, Justice Keenan asked, is there a light case? I don't think there is a light case. The closest is Johnson's versus Kansas City Southern from the Fifth Circuit. In terms of the ascertainability, if you have to resort to title, if you have to look at the local land records, which the reporting recommendation says you have to do, you can't get to a class certification because there are two individual classes. There is no common thread when you're talking about these issues across the common areas. To your question, Justice Wilkinson, about the tort claims, the conversion claim is the best one to look at. Look at their briefs. They cite the 22 out of 67 wells that they looked at. That's the only record evidence that we have. Twenty-two out of 67 that had a claimed conversion of production before pooling. What about the other 45? It begs the question of the individuality of these issues of the torts. Every tort claim would have a different fact pattern dealing with the different wells, the different methodologies that were done, the variables that go into the deductions. It's one thing to say that deductions were done uniformly, but over the course of- Has the district court adequately analyzed the degree of individuation that might attach to the tort claim? They have not. Does that suggest a remand? Does that suggest one of the questions that would be included in a remand? Unfortunately, it could, but the problem is you can't overcome the threshold issue, which was put before this court, which is the ownership issue. If you can't get to the ownership issue, you're in the individualized realm of each of these issues. And you can go back and remand. Your opponent suggested that you could get over the ownership issue, which I think we would all agree is a prior determination that's going to have to be made before royalties can be released because you don't want them to be released to the wrong person. So she says, well, let's have a claims administrator or a special master. In a lot of instances, the ownership issue is going to be fairly cut and dry. And what about a claims administrator that deals with the ownership issue? It goes back to what Mr. Smith said. It's individual by individual. You're going to be doing it on a case by case. There is no real cut and dry way to do this. And to Justice Diaz, in terms of the economics, I ask you just to look at Foster v. Apache. It's a royalty class action case after Walmart v. Dukes. It has the very statements that you did. Potential plaintiffs are many. Some or perhaps most of them have claims as royalty owners, which were not economically feasible to pursue on an individual basis. Defendants' resources for resisting any claim are substantial. But these considerations do not overcome the impracticability of litigating the myriad individual issues present here. That's the problem with it. There's a statute that allows us to do it. If you're trying to consider which is the superior vehicle, is one factor the fact that you've got a large class which includes a number of people with individual resources and with limited resources. And she said that, well, maybe 18 or 20 or 25 of these cases have been brought to some sort of conclusion in the Virginia courts, which is a very tiny fraction. And a lot of people are simply not going to be able to afford to have their royalty rights consumed in attorney's fees. And I can answer that question very simply. The Virginia Gas and Water Act was passed in 1990. It has two mechanisms then, three mechanisms now. One is the split agreement issue. It deals with potentially the frack or gout gas and who has the right to produce or doesn't produce. But the Gas Act deals with that. And it's worked. I cite it to the record where, again, $600,000 in a month was distributed, $200,000 in a month. This is recently. Petitions are put to the Virginia Gas Board all the time. If there's a change that needs to be made, the legislature can do that. It's a Virginia issue, as you said, Judge Wilkinson. Let me ask you a question, Mr. Blank, and I realize your time's up, so I'll be quick. You know, thinking on this, though, as a former trial judge, this case is a nightmare for many of the reasons that you've suggested. But yet the judge certified it anyway. I mean, this kind of case would drive many trial judges into retirement. But he did it anyway. He must have thought at its core this was the only realistic way these people could get anything. Can you answer that? Sure. He expressed his frustration. It's in the record. But you can't get to the class action based on frustration alone. You have to go through those core requirements of Rule 23. If you're going to go on frustration alone, it would proliferate. It would proliferate the class action setting. And here in particular, when you have a mechanism, as Judge Wilkinson pointed out, you've got these other places that the state legislature has set out that are being used every day, or not every day, but over the course of the year, and money is being distributed. Let the state courts do it. Let the legislature fix if it has inefficiencies. Let them fix the inefficiencies. Don't pigeon it into a Rule 23 class action where it doesn't belong. Thank you, sir. Mr. Smith, let's hear from you. If you'll allow me, please, a couple of quick points. When I say this, and it's in answer to your questions about the best vehicle, and I hear questions about some lessors don't have the money to fund the litigation, I don't mean to be presumptuous when I say this, nor do I mean to be overly critical with anyone. But one wonders, why interject into the record questions of equitable estoppel and fraud and ask for a class action? Why do that? You can look back five years and recover for five years. You don't need that if you prove your claim. Why, for instance, hasn't one plaintiff brought the first marketable product claim, implied covenant, in a Virginia court and gotten it to the Supreme Court of Virginia where it ought to be decided? Because remember, in all of this discussion, that's the linchpin for all of this. The linchpin is you don't have to look at contracts. We find ourselves in a very peculiar position, thousands and thousands and thousands of alleged breach of contract cases where the plaintiff says, we don't have to look at any of the contracts for anything. Why? Because we think the first marketable product rule applies. And you're saying no way will that fly in front of the Virginia Supreme Court. I'm not saying no way it wouldn't apply. I'm saying why hasn't it been taken there? They are the ones to decide, Judge Keenan. That's what I'm saying. The Virginia Supreme Court ought to decide that. We haven't talked about that first marketable product. One thing we do know about the Virginia jurisprudence, Virginia jurisprudence will not use an implied covenant to rewrite an express contract. So far, that's what it looks like we've got. That's how they got over having to renew the leases, renew the deeds or anything else. First marketable product. If this case wanted to move along, why haven't somebody taken that case to the Supreme Court of Virginia and found out whether or not it would, in these circumstances, apply a first marketable product rule and implied covenant? That's the linchpin of this entire case for me. And if you want to know the best way to handle this case, I say this with some reservation. I don't suggest to you that the legislature is the best way to do it or a good way. But what I would say is there are some ways that you sit down and think about it, getting some of these issues tried other than in federal court in a class action, particularly when it doesn't work for a class action. Why hadn't that case gone on first marketable product? Supreme Court can deal with the law of implied covenants and when they're appropriate and when they aren't. And if that had been decided, we'd have been well along the way. And for reasons very clear to everybody in this courtroom today, if it were decided by the Virginia Supreme Court for the plaintiffs, it would have an impact on getting rid of a lot of things. A lot of things. Thank you. We'll come down and greet counsel. We thank you both for your arguments. We'll come down and greet counsel and move into our final case.
judges: J. Harvie Wilkinson III, Barbara Milano Keenan, Albert Diaz